THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ROBERT J. POWELL, Defendant-Appellant.

First District (3rd Division)   No. 1—87—3896

Opinion filed December 27, 1991.

Randolph N. Stone, Public Defender, of Chicago (Evelyn G. Baniewicz, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Paul Gliatta, and John deGrasse, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Defendant, Robert Powell, was charged with burglary and theft. After a jury trial, defendant was found guilty on both charges. Judge Robert Boharic sentenced defendant to 14 years' incarceration for burglary and five years for theft, with the sentences to be served concurrently. The judge also imposed a fine of $5,000. Defendant appeals his conviction as well as the sentence and fine.

At appeal, defendant presents five issues: (1) the trial court erred in finding that the State presented neutral reasons for using peremptory challenges to eliminate African-American veniremen; (2) it was reversible error to deny defendant's pretrial motion to suppress evidence seized during the search of defendant; (3) the State failed to prove defendant guilty beyond a reasonable doubt; (4) the sentence of the trial judge was excessive in light of mitigating factors; and (5) the trial court erred in imposing a $5,000 fine in view of the defendant's financial resources.

On the morning of March 20, 1987, Cheryl Burton was working as a teacher at John Calhoun Elementary school in Chicago. She testified that around 11:30 a.m., a man entered her classroom in search of a student. She escorted the man to the main office to obtain a visitor's pass. Ernestine O'Neal was working the counter in the office when this man entered. She noticed that the bag he was carrying contained another briefcase which looked similar to one normally carried by Mary Criss, a teacher at the school. Burton and O'Neal later identified the man as Robert Powell.

Earlier that morning Criss had placed her briefcase beneath her desk. She left around 11:15 a.m. for lunch and when she returned at noon her briefcase, containing her paycheck, credit cards, checkbook and other personal items, was missing. Later that day, while exiting a city bus, Criss spotted a man entering the bus with a similar briefcase. Criss identified this man in court as the defendant. The next day police officers called and asked if she knew Robert Powell and she said she did not. When she arrived at the station to claim her briefcase, she did not mention seeing Powell the day before with her briefcase.

On March 21, 1991, Officers Caldbeck and Schmidt were parked in the vicinity of 1459 North Mohawk. Caldbeck testified he saw two African-American males walking eastbound on Blackhawk. One man was ap-

parently carrying a "television" wrapped in a sheet, and the other man, the defendant, was carrying a pillowcase. The officers stopped the two men and identified themselves as police. Caldbeck noticed that the "television" was actually a computer screen wrapped in a sheet. He asked the defendant about the contents of the pillowcase who replied it was "stuff" belonging to his girl friend. After observing a computer keyboard protruding from the case, bearing the same brand name as the screen, Caldbeck searched the other items in the pillowcase. He found identification and other items belonging to Mary Criss, a small brown bag, a tape container, a school bell, and clothing. Defendant said that Mary Criss was his girl friend. The two suspects were detained at the police station to verify their explanations, which were deemed false after the officers contacted Criss.

We first consider the argument that the trial court erred in concluding that the State presented race-neutral reasons for excluding certain African-American members of the venire and that no purposeful discriminatory intent was evident.

During the *voir dire* examination of the jurors, the defense moved for a mistrial based upon the systematic exclusion of African-American persons. The defense asserted that the defendant was African-American and that four of the five peremptory challenges used by the State were to remove the remaining African-American individuals in the initial panel of 14. The defense also cited race as the only "common thread" among the jurors excluded. The trial judge concluded that the defense had "possibly" made out a *prima facie* case of discrimination under *Batson*, and requested reasons for exclusion from the State. In rebuttal, the State responded with the following explanations:

"With respect to Zidar McClinton *** she has been giggling since the point any questioning has begun.

[As to] Brenda Porter *** she indicated that her ex-husband is currently charged with the offense of murder. I think she can have very negative feelings towards the prosecutors, specifically towards the Cook County State's Attorneys Office.

With respect to Lillian Inglam *** she has a son who is currently unemployed. *** [H]er husband is currently unemployed. *** [T]he defendant in this case being unemployed *** she might harbor *** bias in his favor. She had six kids. She seemed to be trying to withhold information as to what the children were doing. She would only [discuss] four of the kids.

With respect to Mr. Gross *** the primary reason *** he is unemployed *** his wife is unemployed."

At the close of arguments, the court concluded the State had set forth race-neutral reasons for excluding these veniremen and, further, no discriminatory purpose existed.

In the early and precedential case of *Strauder v. West Virginia* (1880), 100 U.S. 303, 25 L. Ed. 664, the United States Supreme Court recognized that the equal protection clause guarantees a defendant that the State will not intentionally exclude members of his race from the jury venire. In our time, the Court held that these same equal protection principles apply to a State's use of peremptory challenges in jury selection. (*Batson v. Kentucky* (1986), 476 U.S. 79, 96, 90 L. Ed. 2d 69, 87, 106 S. Ct. 1712, 1722.) *Batson* held that a defendant may make out a *prima facie* discrimination case totally on evidence concerning the prosecutor's use of peremptory challenges.

To establish a *prima facie* case under *Batson*, first defendant must show he is a member of a cognizable racial group and that the prosecutor removed a member of the defendant's race from the venire by peremptory challenge. Second, defendant may rely on the fact that a peremptory challenge allows discrimination by those with a discriminatory view. Finally, defendant must show that the facts, viewed in light of any other pertinent circumstances, raise an inference that a potential juror was excluded because of race. (*Batson*, 476 U.S. at 95-96, 90 L. Ed. 2d at 86-87, 106 S. Ct. at 1722.) In deciding whether the defendant has made the requisite showing, the trial court may view whether there exists a pattern of deletions against members of the defendant's race. (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) The prosecutor's questions and comments during *voir dire* examination may substantiate an inference of discrimination.

Once the lower court finds a *prima facie* case by the defendant, the burden shifts to the State to provide race-neutral reasons for excluding the prospective jurors. These neutral explanations must be clear, reasonably specific and related to the particular case which the jury will hear. (*Batson*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 89 n.20, 106 S. Ct. at 1724 n.20.) A prosecutor may not merely assert good faith or generally deny a discriminatory motive in selecting jurors. After reviewing the State's explanations, the trial court must then make a finding as to whether the State purposefully discriminated in view of relevant circumstances.

A trial court's determination as to intentional discrimination is a finding of fact and will not be overturned unless it is against the manifest weight of the evidence. (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21.) Because the trial court's finding in a *Batson* hearing largely turns upon credibility, this finding should be granted great deference on review. *People v. Mack* (1989), 128 Ill. 2d

231, 238, 538 N.E.2d 1107; *People v. Mahaffey* (1989), 128 Ill. 2d 388, 413, 539 N.E.2d 1172.

Upon the defense showing that four of five challenges had been used to exclude African-Americans, the trial judge found there was "possibly" a *prima facie* case and then demanded explanations from the prosecutor in rebuttal. As a preliminary matter, we note that a trial court should consider more than mere numbers in evaluating a *prima facie* case. *People v. Young* (1989), 128 Ill. 2d 1, 19, 538 N.E.2d 453.

On appeal, the State does not contend that the trial court erred in finding a *prima facie* case of discrimination, sufficient to demand race-neutral explanations from the State. The defense posits that the trial court erred in accepting the State's rebuttal explanations as race-neutral and further argues that these reasons were pretextual.

The four excluded jurors stated they would be fair and impartial. Zidar McClinton was excused for giggling. A hesitant, nonserious or casual attitude has been cited as adequate to exercise a peremptory challenge. (*People v. Hooper* (1989), 133 Ill. 2d 469, 509, 552 N.E.2d 684; *People v. Young* (1989), 128 Ill. 2d 1, 20, 538 N.E.2d 453; *People v. Mack* (1989), 128 Ill. 2d 231, 240, 538 N.E.2d 1107.) In *Mack*, the State excused five African-American jurors based upon attitude. The State's offered reasons included the failure to make eye contact, slowness and an "odd" word choice in responding, a casual manner, and a failure to comprehend some inquiries. The Illinois Supreme Court upheld the prosecution, citing the vitalness of courtroom conduct and demeanor in jury selection. (*Mack*, 128 Ill. 2d at 240, 538 N.E.2d at 1112.) In *Young*, the court further stated: "The demeanor of a prospective juror has traditionally been a factor of importance in jury selection." *Young*, 128 Ill. 2d at 20, 538 N.E.2d at 457.

■ We initially recognize that a peremptory challenge exercised on the basis of demeanor relies upon subjective findings. Any demeanor-based explanation must be closely watched. (*People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357.) In this case, both the prosecutor and the trial judge observed the inexplicable giggling of the juror. The trial court found this to be a "loose attitude" and concluded that the State's reasons were not pretextual. We cannot say that the finding of the trial court was manifestly erroneous, when it appears as though this prospective juror did not take the proceedings seriously.

■ As for Brenda Porter, the State deleted her because of her ex-husband's pending murder charge. The defense states this is pretextual, as a murder charge is a violent crime unlike the burglary charge herein. Porter is no longer wed to this man and there is a lack of evidence indicating a basis for her bias in favor of the defendant and/or against the

State's Attorney. Finally, the State accepted a white juror, Michael Pellegrino, whose father had been *convicted* of driving under the influence, while Porter's ex-husband had been *charged* with murder, possibly of some value in determining this problem's answer.

In *People v. Hooper* (1989), 133 Ill. 2d 469, 552 N.E.2d 684, the brother of a juror had been convicted of a robbery and sentenced to prison. This was held to be sufficiently race-neutral to exclude the juror, even though the robbery to be tried included a charge of aggravated kidnapping. (*Hooper*, 133 Ill. 2d at 509, 552 N.E.2d at 700.) Similarly, a prospective juror who has been the victim of an unsolved felony may be excused for a lack of impartiality. (*People v. Hope* (1990), 137 Ill. 2d 430, 448, 560 N.E.2d 849.) Although Porter is divorced, a prospective juror has been properly excused where her ex-husband was arrested for murder. *People v. Young* (1989), 128 Ill. 2d 1, 18, 538 N.E.2d 453.

As to defendant's disparate treatment argument, the mere fact that an accepted juror's father received a driving-under-the-influence conviction does not in itself demonstrate pretext. First, there is a disparity in the gravamen of the two offenses. The driving conviction was some time ago and the murder charge was currently being tried. Secondly, Mr. Pellegrino "may have *** exhibited a trait which the prosecutor reasonably could have believed would make him *** desirable as a juror." *People v. Young* (1989), 128 Ill. 2d 1, 23-24, 538 N.E.2d 453.

The State's concern with the impartiality of Porter was an appropriate, specific and race-neutral explanation for excluding her, and we cannot state that the finding of the trial court was against the manifest weight of the evidence.

■ The State next contends that the unemployed status of Lillian Inglam's husband and son sufficed to exclude her, since the defendant in this case was also unemployed. As to the fourth prospective juror, Hollin Gross, the State commented during the *Batson* hearing that the "primary reason" for exclusion was his unemployed status and that of his wife. The State also raised the issue of a post-judgment attachment proceeding currently pending. The defense posits that unemployment alone is insufficient to exclude a juror, especially where it is not neutrally applied to all jurors. The State accepted a white juror, Chester Kacprowski, who stated that one of his children was unemployed.

Unemployment has been held to be a legitimate, race-neutral reason for excluding a member of the venire. (*People v. Morgan* (1991), 142 Ill. 2d 410, 435, 568 N.E.2d 755; *People v. Hope* (1990), 137 Ill. 2d 430, 470, 560 N.E.2d 849, 867; *People v. Mack* (1989), 128 Ill. 2d 231, 241, 538 N.E.2d 1107, 1112.) In *People v. Mack*, one venireman was excused due to an unstable job history and another because of unemployment. The

court held: "We believe that the State's concern over the unemployment status and positions of these prospective jurors was legitimate and race neutral." *Mack*, 128 Ill. 2d at 241, 538 N.E.2d at 1112.

The defendant relies on *People v. Buckley* (1987), 168 Ill. App. 3d 405, 522 N.E.2d 86 (supplemental opinion), for the proposition that unemployment is not a race-neutral explanation. In *Buckley*, the selecting attorney for the State admitted on rehearing that he asked no questions about employment of the three African-American veniremen at issue because he decided to strike them before their turn for questioning arose. The trial court found the State failed to provide race-neutral explanations for the excusal of the three veniremen. Contrary to the defendant's contention, *Buckley* does not stand for the proposition that unemployment is an insufficient explanation for exercising a peremptory challenge.

In the case of Hollin Gross, we cannot say that the unemployment rationale employed by the prosecutor was pretextual. Although the son of an accepted white juror was also unemployed, it does not follow that the State's explanation was pretextual. (*People v. Hooper* (1989), 133 Ill. 2d 469, 511, 552 N.E.2d 684, 701.) We, therefore, concur with the decision of the trial court as to the peremptory challenge of Hollin Gross.

■ We note that the unemployed status of Lillian Inglam's husband and son does not alone suffice to rebut the defendant's *prima facie* case, since she herself was employed as a machine operator for the past nine years. However, the State was also concerned with her evasion of questions concerning her six children, two of whom she did not mention. The defense posits that both of these explanations were pretextual. We agree.

Where a State's explanation rests upon insufficient information about a prospective juror, such an explanation may easily be employed as a pretext for discrimination and must therefore be closely scrutinized. In evaluating such explanations, courts should consider whether the State made any attempt to discover the unknown information. (*People v. Harris* (1989), 129 Ill. 2d 123, 188, 544 N.E.2d 357.) During *voir dire*, upon being questioned about her six children, Mrs. Inglam discussed four of them. The court then moved on to the next question without inquiring further as to the other two children. Moreover, the State did not request that supplemental questions be allowed in order to further clarify the status of the other children. During the *Batson* hearing, the State claimed that Mrs. Inglam appeared to be withholding information, but proffered no evidence that she actively withheld information, nor was any attempt made to extract the missing information.

Although we concur with the trial court's ruling as to three of the four excused venire members, we find that the court's ruling as to Lillian Inglam was manifestly erroneous. The explanations of the State as to Mrs. Inglam were clearly insufficient to rebut the defendant's *prima facie* showing of discrimination. Mrs. Inglam was a hard-working individual who supported both her husband and son. Although she did not discuss all of her children, the State did not probe the issue, nor does the record of the trial court indicate that the State closely scrutinized the status of other venire members' children.

We find that at least one prospective juror, Lillian Inglam, was excluded because of race. Therefore, this case must be remanded for a new trial.

Although this case must be remanded, we will discuss the remaining issues on appeal. Defendant next contends that the search of the pillowcase carried by the defendant was intrusive and beyond the scope of the fourth amendment. We next consider whether the trial court erred in denying defendant's pretrial motion to suppress the evidence seized.

The decision of the trial court on a motion to suppress will not be overturned unless it is manifestly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 535 N.E.2d 837; *People v. Winters* (1983), 97 Ill. 2d 151, 158, 454 N.E.2d 299; *People v. Holloway* (1981), 86 Ill. 2d 78, 91, 426 N.E.2d 871.) In denying the defendant's motion to suppress the evidence found in the police search, the trial court concluded that the stop and seizure were justified under *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. The trial judge concluded that the arresting officers possessed a "reasonable suspicion" sufficient to justify a *Terry* stop and that a "brief detention" of the suspects and their property was in accordance with *Terry*. The court further found that the subsequent conversation with the officers developed into the "probable cause" necessary to effect an arrest of the suspects.

As a preliminary matter, the State argues that the stop and search of the defendant were consensual and thus not violative of the fourth amendment. (See *People v. Krull* (1985), 107 Ill. 2d 107, 481 N.E.2d 703, *cert. granted* (1986), 475 U.S. 1080, 89 L. Ed. 2d 714, 106 S. Ct. 1456, *reversed* (1987), 480 U.S. 340, 94 L. Ed. 2d 364, 107 S. Ct. 1160, *on remand* (1989), 126 Ill. 2d 235, 534 N.E.2d 125.) A warrantless search pursuant to consent is permissible so long as consent is voluntary. *People v. Koniecki* (1985), 135 Ill. App. 3d 394, 481 N.E.2d 973.

Where the State seeks to rely upon a theory of consent to justify the lawfulness of a search, it has the burden of proving that the consent was, in fact, freely and voluntarily given. (*Schneckloth v. Bustamonte* (1973), 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041.) The Court in

**136**

*Schneckloth* found that there were "clearly circumstances from which the trial court could ascertain that consent had been freely given without coercion or submission to authority." Both the arresting officer and another witness at the scene testified that the defendant freely consented to a search. *Schneckloth,* 412 U.S. at 221, 36 L. Ed. 2d at 859, 93 S. Ct. at 2044.

The defendant testified at the pretrial suppression hearing that after he and Campbell responded to questions about the property in their possession, the arresting officers "told [them] to put all the possessions [they] had down on the ground and stand against the [squad] car [to] be searched." During this pat search, Officer Caldbeck found and removed the personal property of Mary Criss from his pockets. Officer Caldbeck testified that he asked the defendant "to empty out the pillowcase he had over his shoulder." He said that when he "looked in" the pillowcase, he saw a brown satchel, containing the personal property of Mary Criss, and a computer keyboard. Defendant testified that the pillow case contained only clothing and that his companion Campbell was carrying a computer keyboard along with a computer screen.

In the instant case, the trial court did not make any specific finding as to consent. Instead, the court sought to justify the search as either a lawful *Terry* search or a search incident to arrest. Based upon the disputed and somewhat vague testimony of the defendant and the arresting officer, we find that there is insufficient evidence in the record to now hold that the search of the defendant's bag was consensual.

We now turn to the decision of the trial court. It should initially be noted that the trial court failed to consider the stop and search of the defendant as two separate and independent acts as is required by *Terry*. Under *Terry*, the validity of a stop is a distinct and separate inquiry from the validity of a frisk or search. *People v. Galvin* (1989), 127 Ill. 2d 153, 163, 535 N.E.2d 837.

As a threshold matter, we first consider the stop. For a police officer to lawfully stop a citizen in a public place, there must exist specific and articulable facts which, taken together with the rational inferences therefrom, create a reasonable suspicion that the person in question has committed or is about to commit a crime. (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 905-06, 88 S. Ct. 1868, 1879-89.) A reasonable suspicion is sufficient to justify a warrantless stop (*People v. Fox* (1981), 97 Ill. App. 3d 58, 62, 421 N.E.2d 1082), and probable cause need not be present. *People v. Zielinski* (1980), 91 Ill. App. 3d 519, 521, 414 N.E.2d 1113.

In the present case, the detaining officers were drinking coffee in an unmarked squad car when they observed the defendant and a friend,

Edward Campbell, walking down the street at midday. Officer Caldbeck testified that he based his suspicions on the fact that Campbell was carrying what appeared to be a television wrapped in a sheet and the defendant was carrying a pillowcase. On this basis, Campbell and his partner stopped the two men and questioned them about the property.

We find under these facts that the officers possessed a "reasonable suspicion" as required by *Terry*, and the initial stop of the defendant was justified. It is not uncommon for residential burglars to conceal stolen property in sheets and pillowcases. Had the police officers pursued the suspects further, they may have eventually eluded the officers. Under the circumstances, it was reasonable to infer that a burglary had recently taken place and a temporary investigatory stop was proper.

We next consider the legality of the search of the defendant's bag. Once detained pursuant to a *Terry* stop, the search of a person and his personal effects must be confined to an intrusion reasonably designed to discover weapons or dangerous objects. (*People v. Felton* (1974), 20 Ill. App. 3d 103, 106, 313 N.E.2d 642; Ill. Rev. Stat. 1989, ch. 38, par. 108—1.01.) The sole purpose of this type of search is to protect the police officers and others nearby. (*Terry v. Ohio* (1968), 392 U.S. 1, 26, 20 L. Ed. 2d 889, 88 S. Ct. 1868.) Objects which look or feel like a weapon may be seized for further investigation. *People v. Gunsaullus* (1979), 72 Ill. App. 3d 440, 444-45, 391 N.E.2d 142.

In Illinois, section 108—1.01 of the Illinois Code of Criminal Procedure of 1963 provides that when an officer has stopped a person for temporary questioning, and he reasonably suspects that he or others are in danger of attack, he may conduct a search for weapons. (Ill. Rev. Stat. 1989, ch. 38, par. 108—1.01.) This search is not limited to the suspect's body but extends to items within his immediate grasp. (*People v. Wilson* (1986), 141 Ill. App. 3d 156, 160, 490 N.E.2d 701.) In *Wilson*, the court upheld a search of the defendant's duffel bag, although he had dropped the bag upon being stopped for questioning. The court stated that "[t]o hold otherwise would subject these officers to the possible danger that upon having the duffel bag returned to the defendant by the officers *** defendant would then produce a weapon from the *** bag and fire at the officers." *Wilson*, 141 Ill. App. 3d at 160, 490 N.E.2d at 704.

In *People v. McGowan* (1977), 69 Ill. 2d 73, 370 N.E.2d 537,two suspected burglars were seen emerging from a deserted industrial area late at night. The court upheld both the stop and limited search of the suspects for weapons. The court found that it was reasonable for the arresting officer to suspect that a burglary suspect would be armed in order to expedite his escape in the event of confrontation. The court

further found that it was reasonable to assume that an armed burglar, if stopped, would not submit peacefully to questioning. We agree.

In the instant case, the arresting officers reasonably suspected that the defendant and his companion were in possession of stolen property. When asked about their possessions, both replied with vague answers as to what they were carrying and the ownership of the property. The defendant claimed he was carrying laundry, but the bulky nature of the items would lead a reasonably prudent police officer to conclude that the contents of the bag were not items to be laundered. Because it was reasonable to infer that the property had been stolen, it was also reasonable to suspect that either the defendant or his companion was armed and dangerous. Officer Caldbeck could not know whether the pillowcase carried by Powell contained a deadly weapon, which could have been used by Powell to fire upon the officers. Moreover, the contradictory nature of the defendant's responses suggested that he was attempting to conceal a weapon or other contraband. Under these circumstances, we concur with the trial court that the search of the defendant's pillowcase was justified under the principles of *Terry*, and defendant's motion to suppress the evidence seized was properly denied.

Defendant next contends that the State failed to prove beyond a reasonable doubt that he entered the school building with the requisite intent to commit a theft therein. Such an intent, prior to entry, is required to uphold a burglary conviction. (*People v. Racanelli* (1985), 132 Ill. App. 3d 124, 476 N.E.2d 1179; Ill. Rev. Stat. 1989, ch. 38, par. 19—1.) A criminal intent formulated after lawful entry will not satisfy the statute. (*People v. Weaver* (1968), 41 Ill. 2d 434, 243 N.E.2d 245.) Authority to enter a building open to the public extends only to those who enter with a purpose consistent with the reason that the building is open. *People v. Bailey* (1989), 188 Ill. App. 3d 278, 543 N.E.2d 1338.

The defense posits that this was a "crime of opportunity" formulated after entry into the building and upon finding the unattended case of Mary Criss. We cannot agree.

■ The defendant told one of the teachers he encountered that he was searching for a student who had been "acting up." A search of the school records revealed that no such student attended the school, and it can reasonably be inferred therefrom that this was a false story concocted by the defendant. The defense presented no evidence to rebut this inference or to offer a valid explanation for the defendant's presence within the building.

Under the totality of the circumstances, it cannot be said that the trial court erred in permitting an inference that the defendant possessed the requisite intent to commit a theft upon entering the school building.

■ Finally, we consider the sentence of the trial court and the fine imposed. The defendant argues that the trial court failed to properly weigh the mitigating factors and that the trial judge abused his discretion in punishing the man and not the crime.

Burglary is a Class 2 felony, carrying a penalty of not less than three years and not more than seven years' imprisonment (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(5)) as well as a fine of up to $10,000 (Ill. Rev. Stat. 1987, ch. 38, par. 1005—9—1(a)(1)). However, where aggravating factors set forth in section 5—5—3.2 of the Unified Code of Corrections are present, the court may impose an extended term of not less than 7 years and not more than 14 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2.) The trial court determined the presence of such aggravating factors and imposed a sentence of 14 years.

At the presentencing hearing, the State proffered the following facts in aggravation: (1) defendant entered a public school and stole personal items belonging to a teacher; (2) defendant is a career criminal with multiple felony convictions; and (3) a TASC report indicated defendant is a drug addict with an "attitude problem" and, thus, possesses very little rehabilitative potential. In mitigation, the defense argued that this was a nonviolent crime of opportunity, without premeditation, involving no physical or financial injury to anyone.

The trial judge must weigh and consider the rehabilitative potential of the defendant as well as the seriousness of the offense committed in determining the imposition of any sentence, and the record must disclose that the court considered both elements. (*People v. Smith* (1980), 91 Ill. App. 3d 438, 414 N.E.2d 1281.) The trial court is not required to give greater weight to rehabilitation potential than to the seriousness of the crime. *People v. Mack* (1985), 133 Ill. App. 3d 788, 479 N.E.2d 445.

The trial judge stated that he considered the fact that this was basically a nonviolent crime, resulting in no physical harm to the victim. However, he considered this factor to be outweighed by the prior criminal history of the defendant and his lack of rehabilitative potential. As to whether the trial court abused its discretion in imposing an extended 14-year term, we do not find the sentence to be excessive.

The final issue is whether the trial judge properly imposed a fine of $5,000. Defendant argues the fine was imposed without inquiring into the defendant's financial resources and ability to pay, as is required under section 5—9—1(d)(1) of the Unified Code of Corrections. However, a trial judge need not specifically state that a defendant was deemed to have adequate resources to pay. Such a finding is implicit where the judge is aware of facts which support that determination. *People v. Markovich* (1990), 195 Ill. App. 3d 999, 552 N.E.2d 1232.

The State posits that the trial court could have determined an ability to pay by the defendant given his prior education, the fact that he had no assets or liabilities and that he was able to support a drug addiction, for which defendant estimated he spent $30 a week. In addition, the trial court noted that the defendant was a career criminal with a history of stealing from others, and that the defendant was an educated man, who could have supported himself by legitimate means. Under these circumstances, we find that Judge Boharic did not abuse his discretion by imposing a fine of $5,000.

CONCLUSION

Because we find that the State failed to rebut a *prima facie* showing of racial discrimination, as to the exclusion of at least one of the members of the venire, the judgment of the circuit court of Cook County is reversed, the conviction of the defendant is vacated and this cause is remanded for a new trial.

Reversed and remanded.

RIZZI and GREIMAN, JJ., concur.